UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER J. HINSON,

              Plaintiff,                       Case No. 1:17-cv-639

v.                                           Hon. Paul L. Maloney

KEVIN YATES, JOHN PONEY,
and STEVEN BANOM,

              Defendants.

_____/

**REPORT AND RECOMMENDATION**

      This is a *pro se* diversity action alleging that defendants committed libel, slander, and other torts against plaintiff.  This matter is now before the Court on defendants' Corrected Motion to Dismiss for lack of personal jurisdiction and request for oral argument" (ECF No. 15). This matter has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The Court will address the motion without oral argument.[1]

      **I.**      **Plaintiff's complaint**

      **A.**      **Background**

      Plaintiff, Christopher J. Hinson, is the owner and operator of Bully-Flo Racing in Lansing, Michigan, and has been "porting and polishing cylinder heads for performance engines since 2014."  Compl.  (ECF No. 1, PageID.2). Plaintiff alleged that "[m]ost of the work done by Bully-Flo Racing includes cylinder heads from GM Buick 3800 Series II and III engines and rebuilding or modifying W-Body vehicles" and that his business "grew rapidly and had become a

---

[1]*See* W.D. Mich. LCivR 7.2(d) ("In its discretion, the Court may schedule oral argument or may dispose of the motion without argument at the end of the briefing schedule.").

well-known, profitable and highly recommended company within the 3800 V6 social media community." *Id*.  Plaintiff alleged that defendants committed a variety of torts against him and his business, including "common law libel per-se[], general libel, slander, intentional infliction of emotional distress, tortious interference with prospective advantage, illegal campaign to defame, tortuous interference with business relations, extortion, blackmail, unfair competition, and false light, giving rise to punitive damages as well, including continuing aggravated harm to plaintiff's professional, business and personal livelihood." *Id*.

Plaintiff brought this action under the Court's diversity jurisdiction, 28 U.S.C. § 1332.  In the caption of the complaint, plaintiff lists his address as Lansing, Michigan, with the three defendants listed as residents of three other states: Kevin Yates (Clearwater, Florida); John Poney (Ford City, Pennsylvania); and Steven Banom (III) (Monroe Township, New Jersey).[2]

### B.    Plaintiff's allegations

Plaintiff alleged that defendants committed 27 wrongful acts: 13 by Yates; 5 by Poney; and 9 by Banom.

### 1.    Defendant Kevin Yates (Yates)

a.    On or about August, 2016, Yates intentionally interfered with an active business relationship between the plaintiff and Neal Jacobi.  Specifically, Yates slanderously convinced Jacobi that plaintiff stole parts from Jacobi and used them in his (plaintiff's) personal vehicle. This false accusation caused lost wages, harm to plaintiff's reputation, monetary damages from loss of expected business with Jacobi, and loss of good standing within the community which affected plaintiff's ability to do business.  Compl. at PageID.2-3.

---

[2] Plaintiff previously filed a similar case, *Christopher Hinson v. Kevin Yates, John Poney, Steven Banom III, Neal Jacobi, and unknown parties*, 1:17-cv-639 (W.D. Mich.).  This case was dismissed *sua sponte* for lack of complete diversity, because both plaintiff and defendant Jacobi were residents of Michigan.

**b.**      On or about September 22, 2016, Yates disparaged products of Bully-Flo Racing when he published false, misleading representations of fact about Bully-Flo connecting rods on a private Facebook group (e.g., "[t]hey only pay $33 each") causing plaintiff emotional distress and damage to his ability to do business.  *Id*. at PageID.3.

**c.**      On or about September 22, 2016, Yates disparaged Bully-Flo Racing products by maliciously publishing false material causing a probability of confusion or misunderstanding as to the sponsorship, approval, or certification of Bully-Flo Racing connecting rods "when alleging that they are 'fake imitation knock offs' on Facebook," causing emotional distress, loss of business and damage to plaintiff's ability to do business.  *Id*. at PageID.3.

**d.**      On or about October 15, 2016 Yates published defamatory statements to the public on Facebook alleging that plaintiff engaged in theft, i.e., "He [plaintiff] stole Neal's Calico coated JE Pistons, wrist pins and Total seal rings, double roller, crower lifters and installed them in his ([p]laintiff's) blown up engine."  These allegations caused plaintiff emotional distress, loss of business, harm to his reputation, loss of good standing with the community and damage to plaintiff's ability to do business.  *Id.*

**e.**      On or about October 15, 2016, Yates maliciously published false statements to the public on his Facebook page that plaintiff engaged in theft, i.e., "I sent him $120 for him to take my front seats, valve spring kit to Neal so he could ship them out 4 weeks ago and now he refuses to do that too."  *Id.*  These false accusations caused emotional distress, loss of business, harm to plaintiff's reputation, and loss of good standing within the community which affected plaintiff's ability to do business.  *Id.*

**f.**      On or about October 15, 2016, Yates published false and defamatory statements on his personal Facebook page about plaintiff, maliciously implying that the plaintiff

3

stole a pallet of parts from Yates.  *Id*. at PageID.4.  This caused emotional distress, harm to plaintiff's reputation, and loss of good standing within the community which affected plaintiff's ability to do business.  *Id*.

      **g.**    On or about October 24, 2016, Yates defamed plaintiff through messages to plaintiff's wife on Facebook. Yates alleged that plaintiff accepted $9,000 from a customer and never started the work contracted to him.  This false allegation caused strain within plaintiff's marriage, emotional distress, and depression.  *Id*. at PageID.4.

      **h.**    On or about October 24, 2016, Yates disparaged plaintiff's business when he accused plaintiff of stealing from customers in the "3800 community".  Yates described plaintiff's business practices as "screwing people over and stealing from them".  This statement was published on a review of plaintiff's business page, Bully-Flo Racing Heads, causing emotional distress, loss of business, damage to plaintiff's reputation, and damage to plaintiff's ability to do business.  *Id*. at PageID.5.

      **i.**    On or about October 24, 2016, Yates started an illegal campaign to defame plaintiff. Yates terminated memberships of members in the "Inside KYRE Program" Facebook group for offering positive reviews of their experience as customers of Bully-Flo Racing.  *Id*. at PageID.5.  Yates convinced former customers that their cylinder heads purchased from Bully-Flo Racing were defective and not prepared as contracted.  *Id*. Yates harassed customers who showed support for plaintiff by calling them "snitches".  *Id*. Yates encouraged members to leave negative or false reviews on plaintiff's Facebook business page, Bully-Flo Racing Heads, i.e., "When you get a chance, you should unlike the BullyFlo page and leave a 1 star review . . ."  *Id*.  Yates' actions caused emotional distress, harm to plaintiff's reputation, loss of business, damage to plaintiff's good standing within the community, and loss of plaintiff's ability to do business.  *Id*.

**j.**     On or about October 29 2016, Yates disparaged plaintiff's business by stating that the pictures of the cylinder head work performed by plaintiff and published on plaintiff's business web page were "Not his work or his Heads."  *Id*. at PageID.5.  Yates also implied to plaintiff's subscribed customers and web page visitors that Yates did 80 percent of the work pictured on the page.  *Id*. at PageID.5.  These false statements and implications were used unfairly, unconscionably, and deceptively to compete with plaintiff. This caused a strong probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of the goods or services pictured, resulting in business decline, emotional distress, and damage to plaintiff's good standing within the community, and damage to plaintiff's ability to do business and earn profits. *Id*. at PageID.5-6.

**k.**     On or about December 4, 2016, Yates blackmailed plaintiff in a telephone conversation, stating "If you give a full refund, I will go on the meet group and make one post, out in the open, saying Chris Hinson has rectified all his wrongs." *Id*. at PageID.4.  This statement was offered to the plaintiff, using plaintiff's fear of the continuing damage to his reputation, loss of wages, damaged ability to do business and subjection to hatred shame and contempt due to defamation previously published by Yates as means to blackmail and/or extort plaintiff.  *Id*.

**l.**     On or about December 6, 2016, Yates maliciously misrepresented Bully-Flo services by broadcasting a video of unfinished cylinder heads from Bully-Flo Racing. Yates disparaged plaintiff's goods, services and business.  Yates included statements such as:  "Do not do business with Bully-Flo racing heads or Chris Hinson.  This is his port work that he pays for the cheapest machine work and charges you maximum dollars."  *Id*. at PageID.4.  This posting caused emotional distress, decline in business, damage to plaintiff's personal reputation and impugning on the business in respect to plaintiff's ability and methods of doing business.  *Id*.

      **m.**     On or about October through December 2016, Yates committed tortious interference with the prospective business relations of over 1300 subscribers to the Bully-Flo Racing Heads Facebook business page by publishing defamatory statements disparaging and discouraging business relationships, causing emotional distress, business decline, harm to plaintiff's personal reputation, good standing with the community and ability to do business. *Id.* at PageID.6.

      **2.**     **Defendant John Poney (Poney)**

      **a.**     On or about October 16, 2016, Poney disparaged Bully-Flo Racing by publishing a review on plaintiff's Bully-Flo Racing Heads' Facebook business page. *Id*. at PageID.6.  Poney's review falsely and maliciously stated as fact that Bully-Flo Racing had "No Proof of flow numbers or gains" causing emotional distress, decline in business, harm to plaintiff's business reputation, good standing with the community and ability to do business.  *Id*.

      **b.**     On or about October 16, 2016, Poney falsely and maliciously alleged that plaintiff threatens to "beat people's asses etc when asking for proof of gains on his product" in a review he published on plaintiff's Facebook business page, Bully-Flo Racing Heads, causing emotional distress, decline in business, harm to plaintiff's personal reputation, harm to plaintiff's business reputation, good standing with the community and ability to do business. *Id*. at PageID.6.

      **c.**     On or about October 16, 2016, Poney engaged in unfair competition when he interfered with plaintiff's prospective business relationships by unfairly, unconscionably, and deceptively soliciting Bully-Flo Racing's customers with a libelous publishing in his business review of Bully-Flo Racing to over 1300 subscribers to plaintiffs Facebook business page, causing emotional distress, business decline, harm to the Plaintiff's personal reputation, good standing with

the community and ability to do business.  *Id*. at PageID.6-7.  However, Poney was not a former customer.  *Id*.

     **d.**     On or about October 16, 2016, Poney engaged in unfair competition by disparaging the goods, services and business standing with false and misleading information written in his review published on plaintiff's Facebook business page, Bully-Flo Racing heads, when stating that the company will "just take your money and block you" causing emotional distress, harm to plaintiff's business reputation, good standing with the community and ability to do business.  *Id*. at PageID.7.

     **e.**     On or about October 16, 2016, Poney intentionally inflicted emotional distress upon plaintiff by publishing malicious libel and shameful rhetoric against plaintiff on plaintiff's Facebook business page, Bully-Flo Racing Heads, causing emotional distress, business decline, harm to the plaintiff's reputation, harm to plaintiff's good standing within the community, and harm to plaintiff's ability to do business.  *Id*. at PageID.7.

     **3.**     **Defendant Steven Banom III (Banom)**

     **a.**     On or about October 1, 2016, Banom committed defamation of plaintiff by publishing a review on plaintiff's Facebook business page which contained the false statement that plaintiff "Scammed and Stole money and parts from many people in the 3800 community" causing emotional distress, business decline, harm to plaintiff's personal reputation, good standing with the community and ability to do business. *Id*. at PageID.7.

     **b.**     On or about October 1, 2016, Banom defamed plaintiff by publishing a review on plaintiff's Facebook business page that falsely, unfairly, unconscionably, and deceptively stated "[a]s of lately, he [Plaintiff] has been refusing to take care of his product all

together", causing emotional distress, business decline, harm to plaintiff's reputation, plaintiff's good standing within the community, and plaintiff's ability to do business. *Id*. at PageID.7-8.

c.     On or about October 1, 2016, Banom exposed plaintiff in a false light by stating "[o]ver time, the truth comes out about his true character-untrustworthy, non-Christian attitude and viewpoints". *Id*. at PageID.8.  This highly offensive statement was published maliciously and strategically placed on plaintiff's Facebook business page for Bully-Flo Racing heads, with reckless disregard to the falsity of the matter attributing to plaintiff's characteristics, conduct, or beliefs which are false and place plaintiff in a false position, causing business decline, emotional distress, harm to plaintiff's personal reputation, harm to plaintiff's good standing within the community, and harm to plaintiff's ability to do business. *Id*. at PageID.8.

d.     On or about October 1, 2016, Banom committed tortious interference with business relations by publishing defamatory and disparaging statements of fact to over 1300 subscribers in form of a "customer review" of plaintiff's Facebook business page, Bully-Flo Racing Heads, causing emotional distress, business decline, harm to plaintiff's reputation, harm to plaintiff's good standing within the community, and harm to plaintiff's ability to do business. *Id*. at PageID.9-10.  However, Banom was not a former customer.  *Id*. at PageID.10.

e.     On or about October 24, 2016, Banom defamed plaintiff in a comment published on plaintiff's Facebook business page.  Banom stated in a comment to a satisfied customer, "When you learn to work on your own car like a big boy, maybe then you will realize that he [plaintiff] is a liar, a scammer, has quality of work that is trash and built his whole car from scamming money from people." *Id*. at PageID.8.  This defamatory "criminal accusation" caused decline in business, emotional distress, and harm to plaintiff's reputation. *Id*. at PageID.8-9.

f.       On or about October 24, 2016, Banom subjected plaintiff in a false light when Banom intentionally cropped a photo of a comment posted by plaintiff on a different site as a customer review of plaintiff's business on Facebook.  *Id.* at PageID.8. The cropped picture omitted information, and took plaintiff's quote out of proper context to imply that plaintiff planned to file bankruptcy.  *Id.*  Banom followed the picture with a comment "[t]o show you what kind of person he [plaintiff] is."  *Id.*  This highly offensive and malicious implication is false and caused emotional distress, damage to plaintiff's reputation and damaged plaintiff's ability to do business.  *Id.* at PageID.8-9.

g.       On or about October 24, 2016, Banom disparaged plaintiff's business with a defamatory photo published on plaintiff's Facebook business page implying that plaintiff was preparing to file bankruptcy.  *Id.* at PageID.9.  This unfair, unconscionable, and deceptive implication to plaintiff's methods and ability to do business caused business decline, loss of profit, loss of ability to earn profits, while damaging plaintiff's ability to do business.  *Id.*

h.       On or around October 29, 2016, during the course of a published argument with plaintiff's customer, Matt Sillbaugh, Banom falsely implied that Bully-Flo Racing was not capable of returning cylinder heads to customers in working condition.  *Id.* at PageID.9.  Banom stated "Good luck getting your heads back in any good working order." *Id.*  This argument was published in a subconversation of a review on plaintiff's Facebook business page, causing emotional distress, business decline, harm to plaintiff's personal reputation, and harm to plaintiff's good standing with the community and ability to do business.  *Id.*

i.       In or about May, 2017, Banom published a statement on Facebook in a conversation with Bobbi Doyle claiming that plaintiff built his car with parts and money stolen from customers.  *Id.* at PageID.9.  Banom stated, "Hah, you mean the car he built by stealing

money and parts from everybody?"  *Id*.  The "criminal accusation" caused emotional distress, business decline, and harm to plaintiff's personal reputation, good standing with the community and ability to do business.  *Id*.

## II.    Discussion

### A.    Legal standard

Defendants seek to dismiss plaintiff's action for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). "Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 377 (1994). The basic statutory grants of federal-court subject-matter jurisdiction are contained in 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1332 (diversity of citizenship jurisdiction). *Arbaugh v. Y & H Corporation*, 546 U.S. 500, 513 (2006).  Here, plaintiff relies on diversity of citizenship under § 1332.  "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (internal citations omitted).   To meet the burden on the issue of personal jurisdiction under Rule 12(b)(2), plaintiffs "need only make a prima facie showing of jurisdiction," *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002), quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir.1996).

"In diversity cases, federal courts apply the law of the forum state to determine whether personal jurisdiction exists."  *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012) (internal quotation marks omitted).

Personal jurisdiction may be found either generally or specifically. General jurisdiction depends on continuous and systematic contact with the forum state, so that the courts may exercise jurisdiction over any claims a plaintiff may bring against the defendant. Specific jurisdiction, on the other hand, grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state.

*Id.* at 678-79  (internal citations omitted).  Once a plaintiff can establish personal jurisdiction under a state's long arm statute, due process requires that the defendants have sufficient minimum contacts with that state.  "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

### B.    Michigan's long arm statute

Here, plaintiff contends that defendants had sufficient contact with the forum state under Michigan's long arm statute for limited personal jurisdiction, which provides in pertinent part:

> The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative arising out of an act which creates any of the following relationships:
>
> (1) The transaction of any business within the state.
>
> (2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort.

M.C.L. §§ 600.705(1) and 600.705(2).

With respect to M.C.L. § 600.705(1), "the 'slightest act of business in Michigan' is a sufficient business transaction for purposes of the statute." *Miller*, 694 F.3d at 679, quoting *Neogen Corp.*, 282 F.3d 883, 888 (6th Cir.2002), and citing *Oberlies v. Searchmont Resort, Inc.*, 246 Mich. App. 424, 633 N.W.2d 408, 430 (2001).  *See Viches v. MLT, Inc.*, 127 F. Supp. 2d 828, 830 (E.D. Mich. 2000) ("The standard for deciding whether a party has transacted any business

under § 600.715(1) is extraordinarily easy to meet. '[T]he only real limitation placed on this [long arm] statute is the due process clause.'") (brackets in original).

With respect to plaintiff's tort claims, M.C.L. § 600.705(2) "specifically permits the assertion of jurisdiction where 'consequences' have been caused in this state." *Cole v. Doe*, 77 Mich. App. 138, 142, 258 N.W.2d 165 (1977). "Generally, an action for libel requires a somewhat stronger showing of the jurisdictionally requisite minimum contact than other types of actions; contract actions require a lesser showing, while ordinary torts require the most minimal showing." *Id*.

As an initial matter, defendant Yates transacted some business with plaintiff in Michigan,  i.e., Yates sent plaintiff $120.00 "to take my [Yates'] front seats, valve spring kit to Neal so he could ship them out 4 weeks ago and now he [plaintiff] refuses to do that." Compl. at PageID.3.  This $120.00 transaction is sufficient to establish limited jurisdiction under M.C.L. § 600.705(1).  Here, plaintiff does not seek relief related to this transaction.  However, plaintiff seeks relief for Yates' tortious conduct which arose from this transaction.  "Section two of the long-arm statute has been interpreted broadly, such that 'any nexus between [business] transaction and tort shall allow limited personal jurisdiction to operate.'" *Lyngaas v. Curaden AG*, No. 17-cv-10910, 2018 WL 1251754 at *4 (E.D. Mich. March 12, 2018), quoting *Brabeau v. SMB Corp.*, 789 F. Supp. 873, 876 (E.D. Mich. 1992).  Accordingly, the Court concludes that defendant Yates is subject to limited personal jurisdiction in Michigan under both M.C.L. §§ 600.705(1) and (2) with respect to this particular claim.

In addition, plaintiff's claims seek relief for various torts which would be subject to M.C.L. § 600.705(2).  With respect to defendant Yates, plaintiff alleged that in August 2016, Yates interfered with an active business relationship between plaintiff and Neal Jacobi by

"slanderously convincing" Jacobi that plaintiff stole parts from Jacobi and used them in his (plaintiff's) personal vehicle. For purposes of the long arm statute, this interference caused "consequences" with plaintiff's business located in Michigan under M.C.L. § 600.705(2).  In addition, Yates allegedly made a number of tortious postings on plaintiff's Facebook business page which had consequences for plaintiff's business located in Michigan, as well as alleged blackmail. *See* discussion, *infra*.  Accordingly, the Court concludes that defendant Yates is subject to limited personal jurisdiction in Michigan.

With respect to defendant Banom, plaintiff alleged that Banom interfered with plaintiff's business relationship with an active customer, Matt Sillbaugh, and also made a number of tortious postings on plaintiff's Facebook business page which had consequences for plaintiff's business located in Michigan.  *See* discussion, *infra*.  Accordingly, the Court concludes that defendant Banom is subject to limited personal jurisdiction pursuant to M.C.L. § 600.705(2).

With respect to defendant Poney, plaintiff alleged that Poney made a number of tortious statements on plaintiff's Facebook business page which had adverse consequences for plaintiff's business located in Michigan.  The tortious actions included Poney interference with plaintiff's business by advising potential customers that plaintiff "threatens to beat people's asses etc when asking for proof of gains on his product" (internal quotation marks omitted).  In this regard, plaintiff's Facebook business page includes a map showing the location of plaintiff's business.  Poney's posting could discourage plaintiff's local customers who do not want to conduct business with someone who will "beat their asses" for asking a question.  *See* discussion, *infra*.  Accordingly, the Court concludes that defendant Poney is subject to limited personal jurisdiction pursuant to M.C.L. § 600.705(2).

### C.     Due process

Since plaintiff satisfied personal jurisdiction under Michigan's long arm statute, the next question is whether defendants Yates, Banom and Poney had constitutionally sufficient contacts with Michigan to establish personal jurisdiction.  In *Southern Machine Company v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968), the Sixth Circuit developed a three-pronged test "for determining the present outerlimits of in personam jurisdiction based on a single act":

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Company*, 401 F.2d at 381.  *See, e.g, Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 505-09 (6th Cir. 2014) (applying the three-pronged test set forth in *Southern Machine Company*).  While *Southern Machine Company* involves the "outerlimits" for a single act, plaintiff has alleged more than a single act.  As discussed, plaintiff alleged that Yates committed at least 13 acts (*see* § I.B.1.a through m), that Poney committed at least 5 acts (*see* § I.B.2.a through e), and that Banom committed at least 9 acts (*see* § I.B.3.a through i).

### 1.     Purposeful availment

The element of "purposeful availment"

> . . . is present where the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum [s]tate, and where the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there.  *Neogen Corp.*, 282 F.3d at 889 (citations, quotation marks, and emphasis omitted). "In the Sixth Circuit, the emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state." *Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 218 (6th Cir. 2006) (citations and quotation marks omitted).

14

*Beydoun*, 768 F.3d at 505-06

        As an initial matter, plaintiff alleged that defendant Yates' interfered with one of his customers in Michigan, Neal Jacobi.  By interfering with plaintiff's business relationship with Jacobi, and Yates' own past business dealings with plaintiff's business in Michigan, Yates should have reasonably anticipated "being haled into court" in Michigan.

        With respect to the allegedly tortious statements published on plaintiff's Facebook business page, the courts use two tests to determine personal jurisdiction.

> In cases of defamatory content published on an internet website, courts have used two different tests to determine whether the "purposeful availment" has been established: the first is based on "how interactive the website is with the people in the forum state" (i.e., "*Zippo*" test) and the second relates to "whether the court can assert personal jurisdiction over defamatory publications that reach into the forum state" (i.e., "*Calder* effects" test).  *Cadle Co. v. Schlichtmann*, 123 F. Appx 675, 678 (6th Cir.2005) (unpublished).

*Hyperbaric Options, LLC v. Oxy-Health, LLC*, No. 12-12020, 2013 WL 5449959 at *5 (E.D. Mich. Sept. 30, 2013).

        "The 'operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state . . . if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.' "  *Cadle*, 123 Fed. Appx. at 678.  Here, none of the defendants operated a website.  For this reason, the Court views plaintiff's claims under the *Calder* effects test:

> In determining whether the defendants publication or dissemination of information can give rise to specific jurisdiction, we must look to *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).  *Calder* sets up the "effects test" for specific jurisdiction. In *Calder*, an actress sued two Florida-based National Enquirer writers in a California court for their unflattering article about her, which was available in California as well as other states. *Id.* at 784. The Supreme Court found that California had personal jurisdiction over the writers because "California is the focal point both of the story and of the harm suffered." *Id.* at 789. The Court noted that the story concerned the actress's activities in California. *Id.* at 788. Additionally,

regarding the "harm suffered," the Court stated that the writers' "intentional, and allegedly tortious, actions were expressly aimed at California," noting that "they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation." *Id.* at 789–90. Therefore, the Court found that the defendants could "reasonably anticipate being haled into court" in California. *Id.* at 790.

*Id.* at 679.

The Court concludes that plaintiff meets the *Calder* effects test. Defendants' alleged tortious statements were posted and disseminated on plaintiff's Facebook business page, where both customers and non-customers could interact with plaintiff and others. Given the nature of plaintiff's business, defendants' actions were aimed at Michigan, the state where plaintiff operated his business and performed the actual work on customers' vehicles by "porting and polishing cylinder heads for performance engines" and "rebuilding or modifying W-body vehicles." Compl. at PageID.2. Plaintiff's Facebook business page anticipated that some customers would visit his business in Michigan by including a map showing the address and location of Bully-Flo Racing Heads in DeWitt, Michigan, with a button to "get directions." *See* Exhibit (ECF No. 16-2). One of the individuals affected by defendants' tortious statements, Neal Jacobi, was a Michigan resident. In this regard, plaintiff's wife executed an affidavit stating that Jacobi picked up the alleged stolen car parts from plaintiff's residence in Michigan in September 2016. Tara Hinson Aff. (ECF No. 16-4, PageID.100-101). Plaintiff's wife also stated in her affidavit that defendant Yates contacted her in or about October 2016 through Facebook Messenger regarding plaintiff's business practices including those involving Jacobi. *Id.* In addition, defendant Banom allegedly interfered with plaintiff's work performed for Matt Sillbaugh in Michigan. Finally, defendant Poney's statement would chill plaintiff's ability to attract visits by local customers in Michigan, when Poney stated that plaintiff would threaten to "beat their asses" if customers questioned his work. In summary, the brunt of the harm from defendants'

16

comments were felt in Michigan, the state in which: plaintiff lived; plaintiff's business was located; plaintiff performed work on the cylinder heads and vehicles; and, where some of plaintiff's customers resided.  Given these considerations, the Court concludes that defendants should have reasonably anticipated being haled into court in Michigan.  Accordingly, plaintiff has established the "purposeful availment" prong as to all three defendants.

### 2.    "Arising from" prong

To satisfy the second prong of the *Southern Machine* test, "the plaintiff must demonstrate a causal nexus between the defendant's contacts with the forum state and the plaintiff's alleged cause of action."  *Beydoun*, 768 F.3d at 506-07.

> As our circuit has explained, "the cause of action must . . . have a substantial connection with the defendant's in-state activities." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1275 (6th Cir. 1998) (quotation marks omitted). Put another way, "[t]he 'arising from' requirement under the second prong [of the *Southern Machine* test] is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state. 'Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract.' " *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723–24 (6th Cir. 2000) (quoting *S. Mach. Co.*, 401 F.2d at 384 n. 29); *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012) ("Even a single act by a defendant directed toward the relevant forum that gives rise to a cause of action can support" a finding of personal jurisdiction. (emphasis added, citation, quotation marks, and alterations omitted)).

*Id.* at 507.

In addressing this prong, the Court rejects defendants' contention that that "their various postings on the internet that [they] made from behind their computer screens in Florida, New Jersey and Pennsylvania" allegedly defaming plaintiff and his business "did not arise out of [d]efendants' contacts with Michigan residents."  Defendants' Brief (ECF No. 15, PageID.78).  As discussed in § II.C.1, defendants' alleged actions were directed at a Michigan resident (plaintiff), a Michigan business (Bully-Flo Racing Heads), a Michigan resident who transacted business with

plaintiff (Neal Jacobi), and customers or potential customers who might visit Bully-Flo Racing Heads in Michigan.  Accordingly, plaintiff has established the "arising from" prong as to all three defendants.

### 3.    "Reasonableness" prong

"The Supreme Court has held that the reasonableness analysis is a function of three factors: '[1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief.' " *Beydoun*, 768 F.3d at 508, quoting *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 113 (1987).  In weighing this factor, the Court concludes that it is reasonable to subject defendants to the personal jurisdiction in Michigan.  Defendants will certainly face a burden being subject to this Court's jurisdiction. However, that is a burden which defendants placed upon themselves by allegedly interfering in plaintiff's business.  Defendants Yates and Banom allegedly interfered in business transactions involving two customers, at least one of whom was a Michigan resident, while all three defendants allegedly posted tortious statements on plaintiff's Facebook business page.  In this regard, defendant Poney's statement that plaintiff "threatens 'to beat people's asses when asking for proof of gains on his product," would have a chilling effect on local Michigan customers who might personally visit plaintiff's business.  *See Burger King Corp.*, 471 U.S. at 477 ("where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable").

With respect to the interests of the forum state, plaintiff alleged that defendants' tortious conduct inflicted harm on both a Michigan resident and a Michigan business.  "Michigan clearly has an interest in protecting a company whose principal place of business is located in

18

Michigan" from acts committed by defendants located in other states. *See Air Products and Controls, Inc. v. Safetech International, Inc.*, 503 F.3d 544, 555 (6th Cir. 2007). The fact that defendants engaged in their alleged tortious conduct while they sat behind their computer screens in Florida, New Jersey, and Pennsylvania does not detract from Michigan's interest in protecting plaintiff and his business.

Finally, plaintiff has an interest in obtaining relief. Plaintiff has alleged that defendants knowingly and repeatedly inserted themselves in plaintiff's personal and business affairs over a period of months in apparent attempts to discredit plaintiff and interfere with plaintiff's business operation in Michigan. Plaintiff should not be required to file three lawsuits in three different states to seek relief for claims arising from actions directed against him, his business, and his local customers, all of whom are located in Michigan.

## III.    RECOMMENDATION

For these reasons, I respectfully recommend that defendants' motion to dismiss (ECF No. 15) be **DENIED** and that the case proceed in this Court.


Entered:  July 9, 2018                              /s/ Ray Kent
                                                    United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).